107 F.3d 866
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
JACOBS PRESS, INCORPORATED, Plaintiff-Appellee,
v.
THE HARTFORD STEAM BOILER INSPECTION & INSURANCE COMPANY,
Defendant-Appellant.
JACOBS PRESS, INCORPORATED, Plaintiff-Appellant,
v.
THE HARTFORD STEAM BOILER INSPECTION & INSURANCE COMPANY,
Defendant-Appellee.
 Nos. 94-1046, 94-1087.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 6, 1994.
Decided March 4, 1997.
 
 ARGUED: Robert Dennis Withers, ROBINS, KAPLAN, MILLER & CIRESI, Atlanta, Georgia, for Appellant. Kenneth C. Anthony, Jr., KNIE, WHITE & ANTHONY, Spartanburg, South Carolina, for Appellee. ON BRIEF: Mark W. Phillips, ROBINS, KAPLAN, MILLER & CIRESI, Atlanta, Georgia, for Appellant. Claude H. Howe, III, EDWARDS & HOWE, Clinton, South Carolina, for Appellee.
 Before ERVIN and MICHAEL, Circuit Judges, and MESSITTE, United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 I.
 
 1
 Jacobs Press Inc. sued Hartford Steam Boiler Inspection and Insurance Company, its insurer under a boiler and machinery policy, for proceeds allegedly due Jacobs when its main printing press broke down and caught fire. A jury sitting in the United States District Court for the District of South Carolina (Greenville Division) awarded Jacobs $731,513.60 for property damage, $417,000 for business interruption loss, and $200,000 compensatory plus $100,000 punitive damages for Hartford's bad faith failure to pay under the policy. Following trial, the district court denied Hartford's motions for judgment as a matter of law and for a new trial, granted Jacobs' motion for prejudgment interest on the property damage and business interruption loss awards, and denied Jacobs' request for attorney's fees under the South Carolina statute authorizing such fees in the event of bad faith refusal to pay insurance claims.
 
 
 2
 Hartford has appealed from the district court's judgment; Jacobs has cross-appealed the court's denial of its request for attorney's fees.
 
 
 3
 We shall reverse in part, reverse and remand in part, and vacate and remand in part.
 
 II.
 
 4
 Jacobs Press Inc. (Jacobs) operates a printing facility in Clinton, South Carolina. As of July 1992, Jacobs maintained several presses, the largest and most important of which was a six color Komori press. The press consisted of eight sections. At one end was a feeder section into which paper was fed, on the other a combined drying unit to dry the inked paper and delivery section to stack the finished product. In between were six columns, each containing a different color of ink, which permitted the application of six different colors on one run-through of a sheet of paper. The press was 40 feet long and 4 feet wide, rested on legs which raised the press three or four inches off the floor, and was bolted to the floor. At the time of the event in question, paper scraps and other combustible debris had accumulated on the floor underneath the press.
 
 
 5
 On Sunday, July 26, 1992, the delivery end of the press was discovered to be on fire. Firemen arrived at the scene and extinguished the flames with water. The net result was that the delivery end of the press sustained severe damage from the fire and much of the rest of the press showed rust damage, apparently from the water used to put out the fire.
 
 
 6
 Jacobs, as might be expected, had taken out insurance policies that it hoped would cover such contingencies. The first of these was a commercial property policy issued by American Economy Insurance Company (American), covering the firm's building, fixtures, machinery, equipment, and such risks as fire.[1] The second policy was a boiler and machinery policy issued by Hartford Steam Boiler Inspection and Insurance Company (Hartford), covering certain defined "accidents" to certain defined "objects." Both policies, albeit with differing limitations, covered the six color Komori press. Both had "other insurance" clauses which required the insurer to share responsibility with regard to any loss covered by another policy.[2]
 
 
 7
 Jacobs promptly made claims under both policies.
 
 
 8
 American accepted coverage under its policy without dispute. One of the two investigators it sent to determine the origin of the fire concluded that an object on the conveyor chain in the press had struck infrared tubes in the drying unit as it traveled through the press, breaking the tubes and producing sparks which ignited the accumulation of paper debris underneath the press. The second investigator concluded that wiring in the dryer unit of the press overheated, causing the press to eventually erupt into flames. Accordingly American paid Jacobs $731,360.93 for the replacement cost of the press,[3] $100,000 for extra expenses that Jacobs would not otherwise have had to expend had the accident not occurred, and $16,513.60 to install a new press, a total of $847,874.53. With regard to the property loss component ($731,360.93), American and Jacobs entered into a "Loan Receipt and Assignment" agreement whereby American's payment was characterized as a "loan ... repayable only in the event and to the extent of any net recovery" by Jacobs against Hartford, with American taking an assignment of Jacobs' claim against Hartford as "security." Jacobs covenanted not to settle any claim without American's written consent, to cooperate in the prosecution of a claim against Hartford, and to appoint American its attorney-in-fact to control the litigation, all to be at American's expense. The agreement did not affect any other claims that Jacobs might have against Hartford, for example, for business interruption loss.
 
 
 9
 Hartford, after brief investigation, denied coverage. It began by sending two claims adjusters to the scene but neither was able to ascertain the cause and origin of the fire. Hartford then engaged an independent investigator, Gary Venz, who advised Hartford that the fire had started when a small arc inside a drying tube conductor in the infrared heating unit of the press fell into and ignited the debris beneath the press. Based on Venz's report and purported exclusions under its policy, Hartford, by letter to Jacobs dated July 30, 1992, denied coverage.
 
 
 10
 Hartford reasoned thus: Its policy would pay for repairing or replacing a covered "object" as well as for business interruption loss so long as the covered "object" was directly damaged as a result of an "accident." It would pay for business interruption loss if the loss was due "solely" to an accident to an object." Accident" was defined under the policy as "a sudden and accidental breakdown" of an "object" or "part of the object." Conceding that the six color Komori press was a covered "object," Hartford took the position that the sudden and accidental breakdown was the arcing of the drying tube conductor within the press as identified by Venz; hence the only direct damage to the press was the damage to the drying tube conductor itself and nothing more. Since the cost of repair or replacement of the drying tube conductor was less than $l,000, the amount of the policy's deductible, coverage would be denied.
 
 
 11
 Hartford contended that the fire and water exclusions under its policy supported this position. Thus, the fire exclusion provided that Hartford would "not pay for ... loss caused by or resulting from ... fire or explosion outside the 'object' that occurs at the same time as an accident or ensues from an accident" (Emphasis supplied). Hartford took Venz's statement that the debris which caught fire was "beneath" the press to mean that the fire occurred "outside" the press and was thus excluded by the policy.
 
 
 12
 Similarly Hartford relied on the water exclusion of the policy to deny coverage. That exclusion provided that Hartford would "not pay for ... loss ... resulting from ... water or other means used to extinguish a fire, even when the attempt is unsuccessful." Since water was in fact used to extinguish the fire and since, in Hartford's view, water caused damage to the press, that damage was excluded even if the fire damage itself was covered.
 
 
 13
 Hartford found further support for its denial of coverage in another clause of the policy that provided that Hartford would "not pay for any loss excluded ... even though any other cause or event contributes concurrently or in any sequence to the loss." In other words, even if a covered cause or event contributed to an outside fire or to water damage, the loss due to the outside fire or water damage would still not be covered.
 
 
 14
 Coverage for the business interruption loss was denied for an additional reason. Hartford's policy provided that it would pay for "actual loss" and "extra expense" during a defined "period of restoration,"[4] provided "the actual loss and extra expense must be caused solely by an accident to an object." Again, Hartford reasoned that the accident to the press involved only the sudden and accidental breakdown within the delivery column and that fire outside the press as well as water used to extinguish the fire were contributing causes to the loss. In Hartford's view the actual loss and extra expense were therefore not "solely caused by the accident to the object" and Jacobs would receive no payment from it.
 
 
 15
 With insurance proceeds from American in hand, however, Jacobs was able to recommence its operations in fairly short order. From August 1992 through the first week of October 1992, it leased time on a five color Komori press from a printer in Charleston, South Carolina. Beginning the second week of October 1992 and continuing through December 1992 when it received and put into service its permanent six color replacement press, it leased and installed at its Clinton facility a four color Komori press.
 
 
 16
 In February, 1993, Jacobs brought suit against Hartford, alleging breach of contract based on the latter's denial of payment for property damage and business interruption loss, asserting as well a claim in tort for Hartford's alleged bad faith failure to provide coverage.
 
 
 17
 Approximately 60 days before trial, Hartford sought to join American[5] as the real party in interest on the grounds that Jacobs was in effect bringing a suit for contribution on American's behalf. The district court denied Hartford's motion and the jury trial proceeded with the results previously recited.[6]
 
 III.
 
 18
 On appeal Hartford makes the following assignments of error:[7]
 
 
 19
 1) It should have been permitted to join American as a party plaintiff because American, having paid Jacobs for part of its loss, was the real party in interest, at least to the extent of the payment;
 
 
 20
 2) With regard to the property damage award, Hartford was entitled to have the jury verdict set aside and a new trial awarded because the verdict improperly held it liable for damage caused by water used to extinguish the fire, an excluded cause of loss, and because the verdict failed to recognize the salvage value of the press;
 
 
 21
 3) With regard to the business interruption loss award:
 
 
 22
 a) Hartford was entitled to judgment as a matter of law because the loss was not caused "solely by an accident to an object";
 
 
 23
 b) It was entitled to judgment as a matter of law because Jacobs failed to prove the amount of its loss in accordance with the terms of the policy or with reasonable certainty; and
 
 
 24
 c) It was entitled to a new trial because the district court erred in its instruction to the jury;
 
 
 25
 4) With regard to the award for bad faith failure to provide coverage, Hartford was entitled to judgment as a matter of law because it had an objectively reasonable basis for denying Jacobs' claim; and
 
 
 26
 5) With regard to prejudgment interest, Hartford was entitled to judgment as a matter of law because (a) Jacobs never prayed prejudgment interest, (b) it had already been paid for its property loss claim by American and (c) South Carolina law prohibits prejudgment interest on lost profits.
 
 
 27
 On cross-appeal, Jacobs contends that the district court erred when it declined to award attorney's fees in connection with the jury's finding against Hartford on the count of bad faith refusal to provide coverage.
 
 IV.
 Failure to Join American
 
 28
 We find persuasive Hartford's argument that the district court erred in denying its motion to join American as a party plaintiff.
 
 
 29
 Jacobs claims that Hartford's motion to add American came too late, having been filed on August 5, 1993, with trial set to begin on September 30 of that year. Jacobs also says Hartford knew about American and its status as a co-insurer several months before and was therefore dilatory in seeking the latter's joinder. In any event, Jacobs argues, Hartford suffered no prejudice by the non-joinder. Since Jacobs had a contractual obligation to pay over to American any monies it might recover from Hartford, there would be no risk of a double recovery against Hartford.
 
 
 30
 Although Jacobs argued untimeliness in the district court, the court did not base its ruling on that ground.[8] Implicitly acknowledging that American was subject to process and that its joinder would not affect its diversity jurisdiction,[9] the court reasoned that "the presence of American ... would contribute nothing to the resolution of the issues raised in the complaint," noting that American had not sought to be added nor would its absence put Hartford at risk of paying twice. The court observed that American had agreed to be bound by the verdict and that the court itself could determine at the conclusion of the Jacobs-Hartford case how much, if anything, American should receive. The court stated that, under the law of this circuit, "if both insurers are liable for the loss, their respective excess clauses, which are mutually repugnant, will result in their sharing the loss equally." See Allstate Ins. Co. v. American Hardware Mut. Ins. Co., 865 F.2d 592, 594 (4th Cir.1989); Reliance Ins. Co. v. St. Paul Surplus Lines Ins. Co., 753 F.2d 1288, 1290 (4th Cir.1985). It concluded that joinder of American was unnecessary and would only result in confusion and prejudice before the jury.
 
 
 31
 We note at the outset that, although Hartford argued for American's joinder below based exclusively on Federal Rule of Civil Procedure 19, its argument before us is primarily based on Rule 17.[10] The rules are sufficiently related, however, that we are prepared to permit Hartford to proceed in this fashion. The purpose of the two rules is essentially the same. Compare Rackley v. Board of Trustees of Orangeburg Regional Hosp., 35 F.R.D. 516, 517 (E.D.S.C.1964) ("The purpose of [Rule 17] ... is to enable the defendant to present his defenses against the proper persons, to avoid subsequent suits, and to proceed to finality of judgment."), with Notes of Advisory Committee to Rule 19a ("Clause (1) stresses the desirability of joining those persons in whose absence the court would be obliged to grant partial or 'hollow' rather than complete relief to the parties before the court. The interests that are being furthered here are not only those of the parties, but also that of the public in avoiding repeated law suits on the same essential subject matter."). Ultimately both rules contemplate the joinder or non-joinder of persons, in the one case because the absent person is "the real party in interest," and the other because their joinder is "needed for just adjudication." Our concern, then, is whether the district court erred in not granting Hartford's request to join American as a party plaintiff, either by reason of its status as a real party in interest under Rule 17 or because it was a person needed for just adjudication under Rule 19.
 
 
 32
 We believe, under both Rules 17 and 19, that American should have been joined as a party plaintiff and that the district court erred in not ordering the joinder.
 
 
 33
 The facts of American's "settlement" with Jacobs bear close attention in this regard. American, as insurer of Jacobs, paid a substantial amount, but not all, of Jacobs' loss. Thus the loan receipt agreement between American and Jacobs covered $731,360.93, the replacement cost of the press, whereas American paid Jacobs $847,874.53, a difference of $116,513.60. Leaving aside for a moment the proceeds covered by the loan receipt, with regard to the other proceeds American in effect received an assignment by operation of law, i.e. it was legally subrogated to a portion of Jacobs' claim against Hartford. See United States v. Aetna Sur. Co., 338 U.S. 366, 380-81 (1949); 16 Couch on Insurance 2d § 61:4 (2d ed.1983). In the case of a partial subrogation, either the subrogor or the subrogee may sue another party liable for the loss. Id. But it is also true that, upon timely motion, the party sued may compel the joinder of the insurer-subrogee or insured-subrogor. Id.; see also Travelers Ins. Co. v. Riggs, 671 F.2d 810, 812-13 (4th Cir.1982); Virginia Elec. & Power Co. v. Westinghouse Elec. Corp., 485 F.2d 78 (4th Cir.1973), cert. denied, 415 U.S. 935 (1974); Pinewood Gin Co. v. Carolina Power & Light Co., 41 F.R.D. 221, 224 (D.S.C.1966); Public Serv. Co. of Okla. v. Black & Veatch, 467 F.2d 1143, 1144 (10th Cir.1972); Standard Accident Ins. Co. v. Lohman, 295 F.2d 261, 264 (7th Cir.1961); State Farm Mut. Liab. Ins. Co. v. United States, 172 F.2d 737, 739 (1st Cir.1949). To the extent of its payment, the insurer-subrogee is deemed the "real party in interest." To the extent of $116,513.60, therefore, under the authorities just cited, American would be joinable as the real party in interest. That much is clear.
 
 
 34
 But, as a leading treatise has pointed out:
 
 
 35
 Difficulties arise when the subrogated insurer seeks to bring suit in the name of the insured in order to avoid the antipathy juries are thought to have toward insurance companies.... As a practical matter, of course, the insurance company will control the prosecution of the law suit no matter in whose name it is brought.
 
 
 36
 6A Charles A. Wright, et al., Federal Practice and Procedure, § 1546 (2d ed.1990).
 
 
 37
 "Loan receipt" transactions of the sort employed here are primary contributors to that difficulty. Wright, et al., elaborate:
 
 
 38
 In some instances it may not be clear that the insurer has been subrogated. For example, under a procedure known as a "loan receipt," the insurer lends the insured the amount due on the policy, and the insured pays it back only to the extent that he is able to obtain a recovery against defendant. Technically the insurer is not the real party in interest, since it has not paid the insured's claim and therefore is not subrogated to his rights.
 
 
 39
 Whether the insurer may sue in the name of its insured under a loan-receipt arrangement depends on whether the court is willing to accept the transaction at face value, either on the basis of its own evaluation of the transaction or in terms of state law in diversity cases. If the loan is treated as genuine, there is no basis for subrogation and the action may be brought in the insured's name. But, if the court views the loan as a sham and as actually constituting payment of the insured's claim, then the insurer is subrogated and must sue in its own name.
 
 
 40
 Id. (Footnotes omitted).
 
 
 41
 It is true that the United States Supreme Court in Luckenbach v. W.J. McCahan Sugar Ref. Co., 248 U.S. 139 (1918), approved the concept of the loan receipt agreement, although it did so in an historical setting rather different from the present.[11] It is also true that, since the adoption of the Federal Rules of Civil Procedure in 1938, including ing Rule 17(a) dealing with real parties in interest, a number of circuits have upheld the validity of loan receipts when used by insureds on behalf of insurers to sue third parties. See, e.g., Frank Briscoe Co. v. Georgia Sprinkler Co., 713 F.2d 1500, 1502 n. 1 (11th Cir.1983); R.J. Enstrom Corp. v. Interceptor Corp., 520 F.2d 1217, 1219-20 (10th Cir.1975); Ketona Chem. Corp. v. Globe Indem. Co., 404 F.2d 181, 184 (5th Cir.1968); see also Acro Automation Systems, Inc. v. Iscont Shipping Ltd., 706 F.Supp. 413, 419-22 (D.Md.1989). In contrast, other circuits have rejected use of the loan receipt device by insurers to circumvent Rule 17(a). See Executive Jet Aviation Inc. v. United States, 507 F.2d 508, 511-13 (6th Cir.1974); City Stores Co. v. Lerner Shops of District of Columbia, Inc., 410 F.2d 1010, 1011-14 (D.C.Cir.1969); see also Potomac Elec. Power Co. v. Babcock & Wilcox Co., 54 F.R.D. 486 (D.Md.1972).
 
 
 42
 While a persuasive case can be made for holding that loan receipt agreements should never affect real-party-in-interest analysis for purposes of federal litigation,[12] we need not decide that broad proposition in this case. Given that this was a suit brought by an insured on behalf of its insurer-subrogee against a co-insurer, we are able to conclude on the facts of the case that the insurer-subrogee was the real party in interest.
 
 
 43
 American Dredging Co. v. Federal Ins. Co., 309 F.Supp. 425 (S.D.N.Y.1970), is directly on point. There the insured was paid by its first insurer pursuant to a loan agreement, with the understanding that the insured would institute suit against co-insurers to cover its loss; the expenses of suit were to be provided by the first insurer; and the insured agreed to pay any sum recovered from the defendant co-insurers in full satisfaction of the first insurer's so-called loan. If no recovery was had against the defendant co-insurers, plaintiff was under no obligation to repay the first insurer. The District Court for the Southern District of New York held that the only right the first insurer had against the co-insurers was one of pro rata contribution, not full subrogation. By pursuing full payment of the loss from the co-insurers, the insured was attempting to confer on its first insurer a substantive right to which it was not entitled, namely full reimbursement. Furthermore, the court held that if the insured were able to recover from the co-insurers for the first insurer's benefit the full amount paid by the first insurer, then the co-insurers in turn would have the right to a pro rata contribution from the first insurer toward the amount the co-insurers had to pay. But, as the court observed, the defendant co-insurers could not assert such a claim against the first insurer in the suit as it stood because the first insurer was not a party. As the court stated, "giving effect to the device employed here would give rise to multiplicity of litigation." 309 F.Supp. at 428. The first insurer was thus deemed the real party in interest under Rule 17(a) and required to be joined to the suit. Notably, since the insured had a claim against the other insurers over and above the first insurer's policy, it was permitted to remain in the suit to that extent.
 
 
 44
 We think all the considerations of American Dredging apply here. Jacobs received proceeds from American and, at American's expense, Jacobs agreed to institute suit against Hartford (actually against any co-insurer). Jacobs was obliged to turn over to American any recovery it might have against Hartford, but would have no liability to American in the event of no recovery. Although by reason of their "other insurance" clauses American and Hartford had mutual rights of contribution, Jacobs' suit against Hartford was an attempt (successful, as it turned out) to obtain full reimbursement for American. Subsequent litigation between the insurers, in all likelihood involving the insured as well, was inevitable. Recognizing in the present transaction potential for a comparable "multiplicity of litigation," we concur in the result of American Dredging. Both as to that portion of its payment covered by the loan receipt, and that part not covered by the loan receipt American is the real party in interest in this suit and should have been joined upon Hartford's motion.[13] We hold that the district court's failure to order its joinder was error.
 
 
 45
 We believe that Rule 19 also dictates joinder of American as a party plaintiff. It is sufficient under Rule 19 if, in the absence of the person to be joined, complete relief cannot be accorded among those already parties or, what is more pertinent to the present case, if the person to be joined claims an interest relating to the subject matter of the action and a person already party to the action might be left at substantial risk of incurring inconsistent obligations by reason of the claimed interest.
 
 
 46
 It is established in this case that American was both amenable to process and its joinder would not have affected the diversity jurisdiction of the court. Other considerations suggest that Hartford would be left with a substantial risk of incurring inconsistent obligations in American's absence. To be sure, the presence of American in Jacobs' suit against Hartford would not necessarily bear on the question of what losses Hartford might be liable for. Such liability would depend exclusively upon the terms of Hartford's policy as to which the terms of American's policy would simply be irrelevant. Determining, however, the exact amounts for which Hartford might be liable without American's presence presents a difficulty. Whatever dollar exposure Hartford might have to Jacobs would necessarily be a function of the language in American's policy. Since Hartford's policy contains a coinsurance clause whereby Hartford's exposure is expressly limited by the existence of other insurance covering the same claim, the fact of American's co-insurance, a precise description of the terms of that insurance, and an equally precise description of its limitations would be fully relevant to determining the extent of Hartford's obligation to Jacobs.[14] Joinder of American would permit not only a convenient, but a complete and accurate sorting out of the co-insurers' respective obligations. See Lucas v. Garrett, 209 S.C. 521, 41 S.E.2d 212 (1947). While it may be true, as the district court stated, that where co-insurers have "mutually repugnant" co-insurance clauses, they must share a covered loss equally, the jury in this case returned a verdict against Hartford on Jacobs' property loss claim for essentially the full replacement cost of the press, i.e. approximately $730,000. If the jury's verdict stands and the full $730,000 passes from Hartford to Jacobs to American (as Jacobs has said will happen), Hartford will have paid more than one-half share of the co-insurance; it will have paid its own one-half and American's one-half as well.[15]
 
 
 47
 American's absence from this suit becomes more sharply apparent when one considers Hartford's liability for "actual loss" and "extra expenses," two components of the business interruption loss endorsement under Hartford's policy. American paid Jacobs $100,000 for items denominated "extra expenses" and approximately $16,500 for "installation costs." As to these sums, which are not covered by the loan receipt, American as previously noted has a subrogated interest as a matter of law. Yet it is by no means certain that the Hartford and American policies are congruent with respect to these losses, which is to say it is not clear that the policies are "mutually repugnant" and that the insurers will have to share those losses equally. Some of the "actual loss" or "extra expense" that Hartford would be fully liable for in the absence of co-insurance will be shared equally with American if American is found to have co-insured the same loss. At the same time, certain "actual loss" or "extra expenses" paid by American under its policy may not be covered by Hartford's policy at all.[16] Had American been joined as a party-plaintiff to this suit, the congruency vel non of its co-insurance with Hartford's with respect to both the property loss and the business interruption loss could have been established once and for all; so too the respective dollar obligations of each insurer to Jacobs could have been ascertained.
 
 
 48
 We recognize that some cases have held that joinder of a co-insurer is not always required. See e.g., Mutual Boiler and Machinery Ins. Co. v. Reynolds Metals Co., 352 F.2d 520 (5th Cir.1965) (joinder of co-insurer not required where "the court can render full and complete justice between the two parties ... without such joinder"); Brinco Mining Ltd. v. Federal Ins. Co., 552 F.Supp. 1233, 1238-39 (D.D.C.1982) (joinder not required where "defendant has not made out a sufficient showing of indispensability"); Special Jet Servs., Inc. v. Federal Ins. Co., 83 F.R.D. 596, 600 (W.D.Pa.1979) (additional insurer, which had "no independent, legally protected right at stake in a proceeding[,]" was not a necessary party). Those cases, however, have typically involved parties whose joinder was not "feasible" within the meaning of Rule 19, i.e. it would have affected the diversity jurisdiction of the court. The courts were thus faced with deciding whether they should dismiss the actions because of the indispensability of the co-insurer or go forward notwithstanding. In opting to go forward, the courts in effect decided that the co-insurers were not "indispensable," which, it must be emphasized, is not the same as saying the parties were not "necessary." Cf. Schlumberger Indus., Inc. v. National Sur. Corp., 36 F.3d 1274, 1286-87 (4th Cir.1994); Evergreen Park Nursing & Convalescent Home, Inc. v. American Equitable Assurance Co., 417 F.2d 1113, 1115 (7th Cir.1969). But in a case in which a party is deemed "necessary" and its joinder "feasible" the overriding consideration is economy of litigation; the proper way to accomplish such economy is by joinder, whether voluntary or involuntary.
 
 
 49
 We conclude that under Rule 19(a) complete relief between Hartford and Jacobs could not be accorded in American's absence. We further conclude, given American's obvious claim to at least a portion of payments found due from Hartford and vice versa, that American's absence from the suit left Hartford subject to a substantial risk of incurring inconsistent obligations. Since American could feasibly have been joined, we hold that it should have been.
 
 
 50
 We will therefore vacate the jury's verdicts in this case and remand the case to the district court for a new trial, with the instruction that American be joined as a party-plaintiff at the earliest convenience. While our decision technically moots certain other issues raised on appeal, in order to facilitate the retrial and reduce the possibility of further appeal, we take the occasion to address those issues at this time.
 
 V.
 
 51
 Failure to Grant Judgment As Matter of Law Because of Water Damage to Press; Jury's Failure to Recognize Salvage Value of Press
 
 
 52
 Hartford argues that it was entitled to judgment as a matter of law with regard to the property loss component of the jury award because water damage occasioned the major portion of the loss and water damage was an excluded cause under the policy. In considering a motion for judgment as a matter of law, we view "all of the evidence in the light most favorable to ... [the non-moving party], drawing all reasonable inferences in ... [that party's] favor...." Johnson v. Hugo's Skateway, 974 F.2d 1408, 1412 (4th Cir.1992). The motion must be denied if, viewing the evidence in the light most favorable to the non-moving party, there is sufficient evidence on the record to support the jury verdict in its favor. Herold v. Hajoca Corp., 864 F.2d 317, 319 (4th Cir.1988), cert. denied, 490 U.S. 1107 (1989).
 
 
 53
 Were it not for the problem arising from American's non-joinder, we would, in the main, find unexceptionable the jury's determination that Hartford should be liable for the damage to the Komori press. Hartford, we observe, does not pursue on appeal a proposition it pursued vigorously below, viz. that fire outside the press, an excluded peril, occasioned the property loss. But conceding that a fire inside the press could have caused the loss, even in part, opens the door to a finding that the same fire could have been deemed responsible for the entire loss. Thus, a jury could fairly conclude that fire rendered the press, though perhaps useable to some extent, essentially undependable thereafter, whether or not there was also water damage. Indeed, Komori's service technician testified that any repair to the press could not be guaranteed. But such a repair may very well equate with no repair at all. Neither Jacobs, nor ultimately a jury, would be obliged to accept anything less than a fully functioning, reasonably warranted machine. Assuming the evidence upon retrial replicates the evidence of the present trial, we would see little justification for granting Hartford judgment as a matter of law with regard to its liability for Jacobs' property loss claim.
 
 
 54
 Hartford is quite correct, however, as counsel for Jacobs conceded at oral argument before us, that any verdict against Hartford for damage to the press would have to give credit for the salvage value of the press, i.e. a net of $98,880.72, after deducting the sales commission.
 
 VI.
 Business Interruption Loss Award
 
 55
 Hartford challenges the jury's award of $417,000 for business interruption loss on a number of grounds. It argues that the court should have granted it judgment as a matter of law, first, because Jacobs' loss was not caused "solely by an accident to an object" and, second, because Jacobs failed to prove the amount of its loss in accordance with the terms of the policy or with reasonable certainty. Alternatively, Hartford claims entitlement to a new trial because the district court erred in instructing the jury with regard to apportionment of loss. We consider these three formulations.
 
 
 56
 A) Failure to Rule Loss Not Covered Solely by Accident to an Object
 
 
 57
 We may deal summarily with Hartford's claim that it should have been granted judgment as a matter of law because Jacobs' business interruption loss was not caused "solely by an accident to an object." Again, to prevail as a matter of law, Hartford would have to convince us that there was no "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment could reasonably return a verdict for the non-moving party.... " Wyatt v. Interstate & Ocean Transp. Co., 623 F.2d 888, 891 (4th Cir.1980).
 
 
 58
 We are satisfied that the record contained sufficient evidence from which a trier of fact could find that Jacobs' interruption loss was caused solely by an accident to the six color Komori press. As we have just observed, a jury could find that a fire occurring inside the press effectively made the press irreparable, notwithstanding the fact that further fire ensued outside the press or that water may have been used to extinguish the fire. As the trier of fact, a jury would be well within its province to conclude that the interruption to business that ensued was occasioned solely by an accident to a covered object. Assuming identical evidence upon retrial, Hartford's motion for judgment as a matter of law on the business interruption loss claim would seem of doubtful prospect.
 
 
 59
 B) Failure to Prove Loss in Accordance With Terms of Policy or With Reasonable Certainty
 
 
 60
 We see no need to address this issue in any detail. We are fully confident that the district court understands that Jacobs has the burden of proving its business interruption loss claim strictly in accordance with the terms of Hartford's policy, that it must do so with reasonable certainty and without duplication as between the "actual loss" and "extra expense" components of the business interruption loss endorsement to the policy.[17]
 
 C) Erroneous Jury Instruction
 
 61
 Hartford requested and the district court refused to give the following jury instruction:
 
 
 62
 When an insured under a business interruption policy sustains loss from multiple causes, some of which are excluded from the coverage of the policy, the insured has the burden of proving the extent of the damage or interruption caused by the covered causes of loss.
 
 
 63
 Hartford excepted to the court's failure to give that instruction.
 
 
 64
 Instead the Court gave the following instruction to which Hartford also excepted:
 
 
 65
 The measure for breach of contract should be the actual damages that the injured party may reasonably have incurred. One injured by the breach of contract is entitled to be placed in the same position, insofar as this can be done with money, as he would have occupied if the contract had been performed. Damages recoverable for a breach of contract are such as may fairly and reasonably be considered as arising naturally from the breach of the contract itself, or such as may reasonably be supposed to have been in the minds or contemplation of the parties at the time they made the contract.
 
 
 66
 Jacobs argues that "the charge of the court covered all issues and was correct on the law." Hartford, claiming error, asks for a new trial.
 
 
 67
 While we have already ordered a new trial on the basis of the joinder issue, we acknowledge that the remedy for a prejudicial jury instructions is likewise a new trial. Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1350 n. 2 (4th Cir.1995). We consider the challenged instruction at this time insofar as it may assist the district court at the next trial.
 
 
 68
 In reviewing a trial court's decision whether or not to give a jury instruction, as well as the content of the instruction, we review for abuse of discretion. United States v. Russell, 971 F.2d 1098, 1107 (4th Cir.1992), cert. denied, 113 S.Ct. 1013 (1993). An error in jury instructions will occasion reversal of a judgment "only if the error is determined to have been prejudicial, based on a review of the record as a whole." Wellington v. Daniels, 717 F.2d 932, 938 (4th Cir.1983). We also note, however, that a party is entitled to an instruction that reflects the party's theory of the case if the instruction is legally correct and there is evidence on the record to support it. Gander v. Mr. Steak of Sun Ray, Inc., 774 F.2d 920, 924 (8th Cir.1985). We consider the latter proposition first.
 
 
 69
 Hartford's theory throughout this action has been that excluded perils--fire outside the press and water damage--were contributory causes to Jacobs' business interruption loss. Evidence in the record amply supported that position, even if the jury may ultimately have found countervailing evidence more compelling. Jacobs, moreover, unquestionably had the burden of proving that, according to the policy terms, Jacobs' total claimed loss was caused "solely" by a covered peril. See 15A Couch on Insurance § 57.32 (2d ed.1983). Hartford requested a charge in precisely these terms, which the district court declined to give. We believe Hartford was entitled to such an instruction and would be so entitled at a new trial.
 
 
 70
 St. Joseph Light & Power Co. v. Zurich Ins. Co., 698 F.2d 1351 (8th Cir.1983), is instructive. There the insured carried two types of insurance, boiler and machinery insurance through Zurich Insurance Company and fire insurance through 16 insurance companies including an "extra operating expense policy" with Great American Insurance Company. A boiler owned by the insured caught fire and sustained serious damage. Great American, among others, paid an amount it deemed to have been caused by fire, but refused to pay for extra expense it attributed to low water condition. In setting aside the jury's verdict against Great American on the extra expense policy, the district court had declared:
 
 
 71
 The jury's duty was to allocate the extra expenses incurred as a result of the damages due solely to fire. However, the evidence presented at trial did not afford the jury any basis upon which to allocate what portion of the outage was caused by the low water condition and what portion was caused solely by fire. The jury's verdict against Great American was pure speculation and must be set aside.
 
 
 72
 698 F.2d at 1358.
 
 
 73
 The Eighth Circuit affirmed with the following observation:
 
 
 74
 Thus, where only a portion of the loss is attributable to fire, only downtime caused specifically by fire damage can constitute a basis for recovery under the policy. We simply do not know, on the basis of the record, how long it took to repair those components which were damaged by fire. Since a low-water condition, rather than a fire, caused some of the damage, SJLP had the burden, in order to support recovery, of establishing how much time was required to repair those portions of the border damaged by fire. The record is devoid of such proof. There is no evidence that repair of portions of the boiler damaged only by fire took one month or thirteen months.... SJLP made no attempt to allocate the extra expense cost between that caused by fire and that caused by the low-water condition.
 
 
 75
 698 F.2d at 1359.
 
 
 76
 St. Joseph Light & Power states an obvious proposition of law. When the terms of an insurance policy limit coverage to loss caused solely by a peril insured under the policy, an insured must offer proof that allows the jury to allocate the amount of the loss caused by the insured peril. See also Hart-Bartlett-Sturtevant Grain Co. v. Aetna Ins. Co., 365 Mo. 1134, 1152, 293 S.W.2d 913, 925 (1956), cert. denied, 352 U.S. 1016 (1957) (reversal required where plaintiff failed to prove that expenses were caused by explosion, a covered peril, rather than flood, an excluded peril). By extension, an insurer is entitled to have the jury informed as to who holds the burden of proof as to coverage and precisely what it entails.
 
 
 77
 We are unable to conclude that the instructions given by the court "construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without mislead ing or confusing the jury to the prejudice of the objecting party." Spell v. McDaniel, 824 F.2d 1380, 1395 (4th Cir.1987), cert. denied, 484 U.S. 1027 (1988). Liability for breach of an insurance contract is dependent upon the terms specified in the contract. Cf. Hutson v. Continental Assurance Co., 269 S.C. 322, 237 S.E.2d 375 (1977), overruled on other grounds, O'Neal v. Bowles, 431 S.E.2d 555 (1993). If, as was the case here, Hartford's policy limited liability for loss to but one peril despite the concurrence of other perils, it might well have misled or confused the jury to have suggested that "the measure for breach of contract should be the actual damages that the injured party may reasonably have incurred" or that recoverable damages "are such as may fairly and reasonably be considered as arising naturally from the breach of the contract itself." Upon receiving that instruction, the jury might well have supposed that, with the fire, Hartford would be responsible for all Jacobs' actual losses or all its damages "arising naturally" from the fire, a conclusion that would clearly be inappropriate to the extent that uncovered perils might be determined to have contributed to the loss. We believe that Hartford correctly articulated the controlling legal principle in this regard and the district court did not. We direct upon retrial that, with regard to Jacobs' claim of business interruption loss, Hartford's request to charge be given. See Furka v. Great Lakes Dredge & Dock Co., 755 F.2d 1085, 1088 (4th Cir.), cert. denied, 474 U.S. 846 (1985); Edwards v. Mayes, 385 F.2d 369, 373 (4th Cir.1967) (cases remanded for new trials based on failure to give jury instructions).
 
 VII.
 Bad Faith Denial of Coverage
 
 78
 We turn our attention next to the jury's award of compensatory and punitive damages on Jacobs' claim for bad faith refusal to pay under Hartford's policy. On the record before us, we conclude as a matter of law that Hartford cannot be found liable on this account.
 
 
 79
 South Carolina law provides that an insurer will be liable for bad faith failure to pay proceeds unless an objectively reasonable basis exists for denying the insured's claim. State Farm Fire & Cas. Co. v. Barton, 897 F.2d 729, 731 (4th Cir.1990) (applying South Carolina law); Varnadore v. Nationwide Mut. Ins. Co., 289 S.C. 155, 158, 345 S.E.2d 711, 713-14 (1986). "Whether such an objectively reasonable basis for denial exists depends on the circumstances existing at the time of the denial." State Farm, 897 F.2d at 731.
 
 
 80
 We agree with Hartford that, on the facts of this case, there could be no bad faith denial of coverage. Our review of the entire record convinces us that Hartford could plausibly have argued, based on the report of its investigator Venz, and indeed as corroborated by American's investigator James Britt and the language of Hartford's policy, that the press fire ignited "beneath" the press, which was on feet raised above the floor, such that the fire occurred outside the press, an excluded cause. At the same time Hartford could fairly have contended that, while it might be liable for damage to the drying conductor within the press, it was not liable for damage to the press caused by water used to extinguish the fire, a further excluded cause. Rust on certain press parts (as observed by Hartford's inspector Propst, Komori's investigator Kirkpatrick and Jacobs' expert Byers) would clearly have justified such a conclusion on Hartford's part. That Hartford's view may ultimately have been rejected by a jury is of no consequence at all. Liability could attach to Hartford if and only if its position as to coverage was taken without any objective basis in fact. That simply was not the case here.
 
 
 81
 Finding no bad faith denial of coverage by Hartford moots Jacobs' claim that it should receive attorneys' fees under S.C.Code Ann. § 38-59-40 (Law.Coop.1993).
 
 VIII.
 Prejudgment Interest
 
 82
 With vacation of the jury's verdicts on both the property loss and business interruption loss claims, the district court's grant of prejudgment interest on those awards necessarily falls. We anticipate, however, that, upon remand and retrial with American joined as a party, the propriety vel non of any prayer for prejudgment interest will appear in sharper focus. We leave to the district court to determine, if the jury ultimately returns a verdict favorable to Jacobs on its business interruption loss claim, whether and to what extent the law of South Carolina permits an award of prejudgment interest upon that sort of award.
 
 IX.
 
 83
 The district court's decision denying Hartford's motion to join American as party plaintiff is reversed and remanded, with the instruction that American be joined to the suit as party plaintiff; The court's entry of judgment on the jury's verdict in favor of Jacobs on its claim of bad faith denial of insurance coverage is reversed;
 
 
 84
 The court's entry of judgment on all other jury verdicts is vacated and the causes remanded;
 
 
 85
 The court's award of prejudgment interest on the property loss and business interruption loss awards is vacated and remanded; and
 
 
 86
 The court's denial of Hartford's Motion for a New Trial is reversed.
 
 
 87
 REVERSED IN PART, REVERSED AND REMANDED IN PART, AND VACATED AND REMANDED IN PART
 
 
 
 [1]
 The commercial property policy was part of an "Economy Package Policy." Separate coverage, at an additional premium, was provided for "general commercial liability," i.e. for sums Jacobs might become legally obligated to pay because of injuries or damages as to which the insurance applied
 
 
 [2]
 American's other insurance clause read:
 G. OTHER INSURANCE
 
 
 [1]
 You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis
 
 
 [2]
 If there is other insurance covering the same loss or damage, other than that described in l. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance
 Hartford's read:
 e. Other Insurance
 (1) You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.
 (2) If there is other insurance covering the same loss or damage, other than that described in (1) above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not.
 In no case will we pay more than the applicable Limit of Insurance.
 
 
 [3]
 There is a slight discrepancy between the amount American paid Jacobs for the replacement cost ($731,360.93) and the amount the jury awarded Jacobs for that cost against Hartford ($731.513.60)
 
 
 [4]
 The "period of restoration," as stipulated by the parties, ran from July 26, 1992, the date of the fire, until December 31, 1992, the date a replacement press was put in service
 
 
 [5]
 Hartford actually sought to join "American States Insurance Company," the entity Jacobs had identified in its interrogatory answer as possibly having a subrogation interest. In fact Jacobs' fire insurance policy and assignment were written with "American Economy Insurance Company." Jacobs does not dispute the apparent alter ego status of the two entities and for purposes of this appeal we shall treat American States and American Economy as one and the same
 
 
 [6]
 Certain additional facts will be set forth in the course of our discussion of the various issues before us
 
 
 [7]
 For convenience, we have changed slightly the sequence of the issues Hartford raises
 
 
 [8]
 There appears to be good reason why it did not. The docket entries below indicate that the parties had until August 25, 1993 to add parties and Hartford's motion to join American was filed on August 5, well within the allowable period. While the window between the time for adding parties and the scheduled trial date may have been unrealistically narrow, the fault is not one that can be ascribed to Hartford. We therefore need not address the issue of whether or when a motion to join an otherwise properly joinable party may be denied for untimeliness. But see Harris v. Illinois-California Express, Inc., 687 F.2d 1361, 1373-74 (10th Cir.1982) (motion for joinder properly denied when party had full knowledge of other insurers for at least eight months prior to trial); Toney v. Bishop, 476 F.2d 203, 207 (5th Cir.1973) (absence of parties who have known of suit since the inception does not affect grant of complete relief)
 
 
 [9]
 Counsel for Hartford certified to the district court that American had indicated its amenability to joinder, advising only that American said it needed time beyond the scheduled trial date to prepare. American itself subsequently filed a pleading objecting to its joinder, but asking for 120 days to prepare should the court require it to join
 
 
 [10]
 Rule 17(a), in pertinent part, provides that "[e]very action shall be prosecuted in the name of the real party in interest."
 Rule 19, in pertinent part, states:
 (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.
 (b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
 
 
 [11]
 See generally Note, "The Real Party Under Rule 17(a): The Loan Receipt and Insurers' Subrogation Revisited," 74 Minn. L.Rev. 1107 (1990)
 
 
 [12]
 Id
 
 
 [13]
 Alternatively American may be considered the real party in interest to the extent that it is deemed an assignee of Jacobs' claim against Hartford. See 61 Couch on Insurance § 110 (2d ed.1983)
 
 
 [14]
 We note that the district court and the parties, at least at the inception of the trial, were under the impression that the general rule of evidence precluding reference to the existence of insurance prevented any reference to the fact that Jacobs had received insurance proceeds from American. While the district court eventually permitted Hartford to apprise the jury of the fact of American's payment after Jacobs' president attempted to convince the jury that Jacobs was totally without funds during the period of restoration, we point out that this misapplies the evidentiary rule
 Federal Rule of Evidence 411 pertains only to the admissibility of evidence of "liability insurance." A policy that covers an insured for damage to its own property, however, is not a "liability" policy but an "indemnity" policy. See Black's Law Dictionary 804-05 (6th ed.1990); supra note 1.
 Apart from that, any suit in which an insurer is a party-defendant obviously requires reference to insurance, particularly a suit involving coinsurance when the fact and extent of the defendant-insurer's liability can only be defined with reference to the terms of the co-insurer's policy. See Public Service Co. of Okla., 467 F.2d at 1144. Reference to American's payment of proceeds to Jacobs, therefore, was wholly appropriate throughout the Jacobs-Hartford trial.
 
 
 [15]
 Both sides agree that the jury's award was erroneous in that it did not take into account the salvage value of the press, $98,880.72, after deducting the sales commission. The fact that American may have paid Jacobs that amount by mistake has obvious implications for any claim for contribution it may have against Hartford. This is one example--there are others cited in the text--of a "loss" that Hartford may not have to share equally with American
 
 
 [16]
 Hartford, for instance, disputes that any of the approximately $16,500 American paid Jacobs for installing the four color Komori press in November of 1992 consisted of "extra expenses" as defined in Hartford's policy
 
 
 [17]
 We note that at trial Jacobs conceded that, inasmuch as it had suffered net losses each month for a considerable period prior to the press fire, it could not claim lost profits under the Hartford policy. See Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co., 360 F.2d 531, 534 (8th Cir.1966)